Ali Moghaddas (SBN 305654)
amoghaddas@edelson.com
EDELSON PC
11601 Wilshire Boulevard, Suite 1970
Los Angeles, California 90025
Tel: (310) 694-0331

*Attorney for Plaintiffs*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| LANCE YOUNGE and JENNIFER GEARY, <br><br> *Plaintiffs*, <br><br> v. <br><br> SAMUEL ALTMAN, an individual, OPENAI FOUNDATION, a Delaware corporation, OPENAI OPCO, LLC, a Delaware limited liability company, and OPENAI GROUP PBC, a Delaware public benefit corporation, <br><br> *Defendants*. | Case No.: <br><br> **COMPLAINT FOR:** <br><br>   **(1) Negligent Infliction of Emotional Distress.** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Lance Younge and Jennifer Geary bring this Complaint and Demand for Jury Trial against Defendants Samuel Altman, OpenAI Foundation, OpenAI OpCo, LLC, and OpenAI Group PBC (collectively, "OpenAI," "OpenAI Defendants," or "Defendants," unless otherwise specifically stated), and allege as follows upon personal knowledge as to themselves and their own acts and experiences, and upon information and belief as to all other matters.

**<u>NATURE OF THE ACTION</u>**

1.     On the morning of February 10, 2026, an eighteen-year-old shot and killed their mother and eleven-year-old brother in their family home in Tumbler Ridge, British Columbia. The Shooter then drove to Tumbler Ridge Secondary School with a modified rifle and opened fire. They killed six people inside the school, including five children, and wounded twenty-seven more

COMPLAINT                                                 1

before killing themselves. It was one of the deadliest mass shootings in Canadian history.

2.    Lance Younge is the legal guardian of E.S. and his younger sister K.S. Jenny Geary is Lance's spouse and the children's stepmother. Lance and Jenny have raised E.S. and K.S. as their own children in their home in Tumbler Ridge.

3.    On February 10, 2026, fifteen-year-old E.S. called home from inside a utility closet at Tumbler Ridge Secondary School. E.S. was supposed to be walking home with his sister, K.S., a twelve-year-old student at the school. But E.S. was hiding from the attack. In a shaky voice, E.S. told Lance and Jenny what was happening. He said there was a shooter in the school, that he loved them, and that they should not come to the school. He said he did not know where K.S. was. Lance and Jenny began to receive automated alerts about the shooting and instructions to stay in their home.

4.    K.S. was shot multiple times in the hallway outside the school library. She was carried into a classroom where a teacher and students desperately tried to save her life for approximately forty-five minutes. Despite their efforts, K.S. died of bullet wounds to her head, jaw, and abdomen.

5.    Tragically, E.S. and K.S.'s family is not the only one to bury a child or say goodbye through a body bag. Tumbler Ridge is a mining town of roughly 2,000 people, and the attack touched nearly every family in it. Children watched classmates shot at point-blank range and a teacher killed in front of them. They hid in bathroom stalls and closets, praying the Shooter would not hear them. Some pulled the injured and the dead into their hiding places, careful not to leave trails of blood that could lead the Shooter to them. Parents were asked to identify their children by their clothing, because the gunshots had left little else to recognize. The survivors—students, teachers, and parents alike—are living with physical and psychological injuries that will never fully heal. Tumbler Ridge Secondary School has been closed and will be razed. The children who can return to school at all are doing so in trailers set up as makeshift classrooms.

6.    In the weeks that followed the attack, a sickening truth emerged: ChatGPT played a role in the mass shooting and OpenAI could have, and should have, prevented it. Sadly, the victims didn't learn this because OpenAI was forthcoming, but because its own employees leaked

it to the Wall Street Journal after they could no longer stomach the company's silence. Those whistleblower disclosures and OpenAI's eventual admissions revealed that ChatGPT deepened the Shooter's violent fixation and pushed them toward the attack—the predictable result of a design choice OpenAI made to let ChatGPT engage with users about violence in the first place. But the design choice was not the worst of it. OpenAI knew the Shooter was planning the attack and, after a contentious internal debate, made the conscious decision not to warn authorities.

7. In June 2025, just eight months before the attack, OpenAI's automated system flagged the Shooter's ChatGPT account for gun violence activity and planning. The account was routed to members of a specialized safety team who reviewed the conversations and determined that the Shooter posed a credible and specific threat of gun violence against real people. The safety team urged OpenAI to notify the Royal Canadian Mounted Police ("RCMP").

8. Sam Altman and his leadership team knew what silence meant for the citizens of Tumbler Ridge. They were focused on what disclosure meant for themselves. Warning the RCMP would set a precedent: OpenAI would be compelled to notify authorities every time its safety team identified a user planning real-world violence. Given the volume of chat-induced violence on ChatGPT, that would require a dedicated law enforcement referral team tasked with reporting OpenAI's own users to authorities. And the public would finally see what OpenAI was desperately trying to hide: that ChatGPT is not the safe, essential tool the company sells it as, but a product dangerous enough that its makers routinely identify its users as threats to human life.

9. For OpenAI, this was a question of corporate survival. OpenAI is on the cusp of an initial public offering ("IPO") at a valuation approaching one trillion dollars, a transaction that would make Sam Altman one of the wealthiest and most powerful people on earth. But Altman's reign is fragile. OpenAI's Board of Directors has fired Altman once before, in November 2023, for not being "consistently candid" about safety. So Altman and his team understood that revealing another instance of violence, where ChatGPT was helping a teenager plan yet another violent act—this time a mass shooting—could end his tenure, derail the IPO, and wipe out the company's valuation. They did the math and decided that the safety of the children of Tumbler Ridge was an acceptable risk.

10. The calculation is a familiar one. In the 1970s, Ford kept selling the Pinto after its own engineers warned that the fuel tank design would cause people to burn to death in rear-end collisions. Ford concluded that paying settlements to the families of the dead would cost less than fixing the car. OpenAI has made a version of the same calculation. For Ford, the dangerous design was a flaw in an otherwise ordinary product. But for OpenAI, the dangerous design *is* the product. The features that make ChatGPT unsafe—its willingness to engage on any topic, to validate any user, to sustain any fixation over time—are the same features that have made it one of the most popular products in history. Fixing those features would cost OpenAI its market share, its path to an IPO, and hundreds of billions of dollars in valuation. It has decided that facing large judgments, even for children killed in mass shootings its product helped plan, costs less than telling the public what ChatGPT actually does.

11. And so, in June 2025, company leaders overruled the safety team members, vetoed their recommendation to notify the RCMP, "deactivated" the Shooter's account, and kept what they had seen to themselves—hoping that whatever happened, it would not be traced back to the company. When the story eventually broke, Altman and OpenAI lied. First, they claimed to have "banned" the Shooter's account. But as explained below, OpenAI does not ban users. It only "deactivates" them—a process that can be reversed within minutes by registering a new account. The Shooter did exactly that, and continued using ChatGPT to plan the attack.

12. When OpenAI was later forced to disclose that the Shooter created a new account, it told a second lie: it claimed they must have "evaded" the company's safeguards to create one. But there were no safeguards to evade. The Shooter simply followed OpenAI's own instructions to create a new account after being banned. The "safeguards" OpenAI pointed to after the attack did not fail; they did not exist. OpenAI lied because the truth is worse: the company does not ban users for violent activity. It tells them how to come back in.

13. Those instructions were no accident. Neither were the missing safeguards. They are part of a pattern. After every tragedy, OpenAI promises to do better. But it never promises to do the one thing that would actually make a difference: stop ChatGPT from engaging with users about violence and self-harm in the first place. When ChatGPT was first offered to consumers in

2022, it was programmed to categorically refuse those conversations. But OpenAI stripped out that safeguard in May 2024 when it realized that refusals were suppressing user engagement. For OpenAI, engagement is the whole business—every conversation trains the next model, and every minute a user spends in ChatGPT grows its market share. OpenAI therefore programmed ChatGPT to participate in almost any conversation a user brings to it, no matter how dangerous.

14.    OpenAI failed to apologize for its role in the shooting for over two months after the attack. It was not until the RCMP announced its investigation was in its "final stages," and not until Premier David Eby and Mayor Darryl Krakowka privately pressed him to respond, that Sam Altman finally published a late-Friday letter to the community. In it, he acknowledged, "I am deeply sorry that we did not alert law enforcement to the account that was banned in June." But Altman announced no changes to its law enforcement referral policy and did not even commit to restoring the pre-May 2024 refusal safeguards. He instead offered what OpenAI has offered after every prior tragedy—that the company's "focus will continue to be on working with all levels of government to help ensure something like this never happens again"—without identifying a single operational change, let alone one that would make a difference. Had OpenAI's original safeguards remained in place, ChatGPT would have refused to discuss violence with the Shooter at all. E.S. would not have been traumatized during the attack, and K.S. would be alive today.

15.    Accordingly, Plaintiffs bring this action to hold Sam Altman and OpenAI accountable for designing a dangerous product, ignoring the warnings of their own safety team, refusing to notify authorities when they knew the Shooter was planning a mass attack, inviting them back onto the platform after deactivating their account, and choosing profit over the lives of the children of Tumbler Ridge.

## PARTIES

16.    Plaintiffs Lance Younge and Jennifer Geary are natural persons and residents of the Province of British Columbia, Canada. They are citizens of Canada. E.S. is, and K.S. was, a member of and resident in Plaintiffs' household.

17.    Defendant Samuel Altman is a natural person residing in San Francisco, California. He is a citizen of California. As co-founder and Chief Executive Officer of OpenAI, Altman

directed the design, development, safety policies, and deployment of ChatGPT. In 2024, Altman knowingly accelerated GPT-4o's public launch while deliberately bypassing critical safety protocols.

18.    Defendant OpenAI Foundation (formerly known as OpenAI, Inc.) is a Delaware corporation with its principal place of business in San Francisco, California. At all relevant times, OpenAI, Inc. was the nonprofit parent entity that governed the OpenAI organization and exercised oversight over its for-profit subsidiaries, including OpenAI OpCo, LLC. As the governing entity, OpenAI, Inc. was responsible for defining the organization's safety mission, establishing its risk-management framework, and publishing the official "Model Specifications" that set the policies and requirements applicable to the development and deployment of OpenAI's artificial intelligence models.

19.    Defendant OpenAI OpCo, LLC is a Delaware limited liability company with its principal place of business in San Francisco, California. OpenAI OpCo, LLC is the for-profit operating entity within the OpenAI corporate structure, responsible for the development, deployment, and commercialization of the defective product at issue. OpenAI OpCo, LLC managed and operated the ChatGPT product that the Shooter used to plan their attack, including the infrastructure and systems through which GPT-4o was delivered to end users. On information and belief, the members of OpenAI OpCo, LLC include OpenAI Foundation, a Delaware nonprofit nonstock corporation with its principal place of business in California. On information and belief, tracing through each tier of ownership to its ultimate natural-person and corporate members, no member of OpenAI OpCo, LLC is a citizen or subject of Canada.

20.    Defendant OpenAI Group PBC is a Delaware public benefit corporation with its principal place of business in San Francisco, California. OpenAI Group PBC was formed on October 28, 2025, as part of a corporate restructuring consolidating OpenAI's for-profit operations. On December 31, 2025, OpenAI Holdings, LLC—the for-profit holding entity that owned the core intellectual property underlying GPT-4o and the other commercial models at issue—merged into OpenAI Group PBC and ceased to exist. As successor to OpenAI Holdings, LLC and the other predecessor for-profit entities, OpenAI Group PBC is liable for their conduct,

designed, deployed, and profited from ChatGPT, and continues to do so today.

21. OpenAI Defendants collectively played the most direct and consequential roles in the design, development, approval, and deployment of the defective product at issue. OpenAI Foundation established the safety mission it failed to enforce. OpenAI OpCo, LLC built, deployed, and sold the defective product at issue. OpenAI Group PBC owns the underlying technology and is liable as successor to the predecessor for-profit entities that profited from it. Samuel Altman is named as the chief executive who personally directed the reckless strategy of prioritizing a rushed market release over the safety of vulnerable users and the public. Together, these Defendants represent the key actors whose decisions directly caused the harm at issue.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) because Plaintiffs are citizens of Canada, OpenAI Defendants are citizens of California, and the amount in controversy exceeds the sum of $75,000.00.

23. This Court has personal jurisdiction over the OpenAI Defendants because they conduct business in this District, reside in this District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

24. Venue is proper in this District under 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to Plaintiffs' claims occurred in and emanated from this District, and OpenAI Defendants reside in this District.

## DIVISIONAL ASSIGNMENT

25. Pursuant to Civil L.R. 3-2(c), divisional assignment to San Francisco is appropriate, because OpenAI is headquartered in San Francisco County and a substantial part of the events or omissions giving rise to the claim occurred in San Francisco County.

## FACTUAL BACKGROUND

### I. The Tumbler Ridge Mass Shooting.

26. On February 10, 2026, an eighteen-year-old resident of Tumbler Ridge, British Columbia carried out one of the deadliest mass shootings in Canadian history. The Shooter first shot and killed their mother and eleven-year-old brother at their family home. They then traveled

to Tumbler Ridge Secondary School armed with a modified rifle and a long gun and opened fire, killing five children and an education assistant and injuring twenty-seven others. The rampage ended with the Shooter's suicide.

27. E.S. is a fifteen-year-old student at Tumbler Ridge Secondary School. He survived the attack by hiding in a closet. If it had been a normal day, E.S. would have been walking home with his younger sister, K.S. Instead, he called Lance and Jenny from the closet and told them that there was a shooter in the school, that he loved them, that they should not come to the school, and that he did not know where K.S. was.

28. E.S. was fiercely protective of his younger sister, K.S., who was a twelve-year-old student at the school. She was brutally shot during the attack, and suffered for approximately forty-five minutes while a teacher and class of students tried to keep her alive. K.S. loved animals and art, and dreamed of going to art school in Toronto. She was a tender-hearted person who was the glue of Plaintiffs' family.

29. Lance Younge and Jennifer Geary have raised E.S. and K.S. as their own children and shared a home with them in Tumbler Ridge. Lance and Jennifer learned through E.S.'s phone call that their son was hiding from a shooter inside his school. They later learned that K.S. had been shot and killed. Lance and Jennifer have suffered severe and lasting emotional distress as a result.

## II. OpenAI Knew the Shooter Was Planning the Attack and Rejected Its Own Safety Team's Advice to Notify Law Enforcement.

30. In June 2025—eight months before the attack—OpenAI's automated review system flagged extensive activity on a ChatGPT account describing scenarios involving gun violence. The conversations with ChatGPT spanned multiple days. The system routed the account to what OpenAI has described as a specialized pipeline for users "planning to harm others," where conversations "are reviewed by a small team trained on our usage policies and who are authorized to take action, including banning accounts" and "[i]f human reviewers determine that a case involves an imminent threat of serious physical harm to others, we may refer it to law enforcement."

31.     OpenAI's human reviewers did exactly what this policy contemplated. They reviewed the Shooter's flagged content. They were not confused about what they were reading. Multiple team members explicitly recommended contacting the RCMP. They identified what they believed was a credible and imminent threat of serious physical harm to real people. These trained safety professionals—people whose job was to evaluate exactly this kind of content—analyzed the Shooter's conversations and concluded that the authorities must be notified.

32.     OpenAI's leadership overruled them. Company leaders argued that the case "did not meet OpenAI's threshold of 'credible and imminent' risk of physical harm." The safety team employees who reviewed the Shooter's account had received specialized training in evaluating threatening content and assessing real-world risk. Altman and the company leaders who overruled them did not pretend to have any comparable training or expertise. They had none. Instead, they had authority, and they used it to override the people who did. The account was deactivated; the Shooter was permitted to start a new account. No one called the RCMP. Nobody in Tumbler Ridge was warned.

**A.     Company Leadership Overruled the Safety Team With Full Knowledge That ChatGPT Had Already Been Used to Plan Mass Violence.**

33.     By June 2025, the company had clear knowledge that its product was being used by disturbed individuals to plan and prepare for violence against real people. Some publicly known examples:

- In January 2025, a man used ChatGPT for feedback on how to use explosives and evade surveillance before detonating a Tesla Cybertruck in front of the Trump International Hotel in Las Vegas.

- In April 2025, a twenty-year-old gunman carried out a mass shooting at Florida State University. Chat logs obtained from a state's attorney's office showed that the gunman had used ChatGPT extensively in the lead-up to and during the attack. The gunman's conversations with ChatGPT had included questions about how to fire a shotgun, the legal fates of school shooters, and when the student union would be busiest.

- In May 2025, a teenage boy in Finland used ChatGPT for nearly four months to help prepare for an attack in which he stabbed three fourteen-year-old girls at his school. Finnish authorities reported that the boy had made hundreds of chatbot queries, including research into stabbing tactics, concealment of evidence, and information on mass killings.

34.     On information and belief, Altman and OpenAI know of countless more incidents

COMPLAINT                                                        9

where ChatGPT helped users plan or carry out attacks on third parties, including family and community members, public figures, and/or large groups of people.

35.    The safety team members who reviewed the Shooter's account in June 2025 knew all of this. When they urged OpenAI to contact the RCMP, they were not speculating what might happen. They identified a pattern that had already repeated itself many times that year. OpenAI's leadership overruled them.

**B.    OpenAI's Supposed Concerns About the Shooter's "Privacy" Were Just Pretext to Conceal ChatGPT's Role in the School Shooting.**

36.    When it was revealed after the attack that OpenAI had rejected its safety team's demand to alert Canadian law enforcement, the company attempted to justify its decision by explaining that it "weighs the risk of violence against privacy considerations and the potential distress caused to individuals and families by getting police involved unnecessarily." If taken at face value, this justification is more damning than the decision itself—it reveals that OpenAI's business leaders believed their own untrained judgment about when to involve police was more reliable than the judgment of the safety professionals they employ specifically to make that call.

37.    As it turns out, the Shooter was already known to local law enforcement before the attack. Canadian authorities had visited the residence multiple times in connection with mental health concerns and had temporarily removed firearms from the home. A law-enforcement referral from OpenAI would have reached police who already had an open file on the Shooter, who had already been to the home, and who had already recognized the Shooter as someone whose access to firearms warranted immediate intervention.

38.    The real reason OpenAI stayed silent was not privacy. It was self-preservation. A former member of OpenAI's investigations team has confirmed as much. Tim Marple, who worked on the team responsible for flagging dangerous users, told the New York Times that OpenAI was reluctant to report users to law enforcement because doing so "forces them to share information about how their product is potentially exacerbating the threat environment." In a conversation about a mass shooting, Marple explained, ChatGPT "might be providing strategically valuable, illustrative scenarios."

39.    Altman and his team understood that if the public saw how far ChatGPT had

already gone in helping real people plan violence, it would pose an existential risk to OpenAI and a personal risk to Altman. Since ChatGPT's launch, OpenAI has worked to build a simple narrative: its product is safe, essential, and should be used every day. It has marketed ChatGPT to parents as a homework helper, to workers as a daily assistant, and to governments and defense contractors as a tool for national-security work. Altman has testified before Congress, appeared at international summits, and met with heads of state to deliver a single message: that ChatGPT is a responsible product built by a responsible company.

40.    In fact, OpenAI has spent, on information and belief, hundreds of millions of dollars on advertising, public-relations campaigns, and "trust and safety" messaging designed to reassure the public that using ChatGPT is safe, while simultaneously deploying a federal and state lobbying operation aimed at securing legal protections that would shield it from liability when its product causes harm. It has retained outside crisis communications counsel, senior former government officials, and, on information and belief, criminal defense attorneys to advise them of potential criminal liability stemming from the deaths caused by their product. All of this has been in service of a race—for market share, for an approaching one-trillion-dollar valuation, and for an IPO that would rank among the largest in history—against rivals that market themselves as the safer alternative. OpenAI understood that the race had a finite window. More users were dying. More reporters were asking questions. A criminal investigation has opened in Florida. Sam Altman's own Board of Directors had already tried to oust him once, in November 2023, for lack of candor about safety. Every new disclosure about ChatGPT's role in real-world violence brought the company closer to the moment when the public, regulators, or its own board would force the market to reprice the product—and with it, Altman's personal position at OpenAI. Defendants' concealment strategy was not an attempt to keep ChatGPT's dangers secret forever. It was an attempt to keep them secret long enough to complete the IPO.

41.    That is the backdrop against which Altman and his leadership team made the decisions at issue here. They knew that if regulators, investors, or the public learned that ChatGPT was already being used to plan shootings—and that OpenAI had ignored its own safety staff and refused to alert police—the narrative they had spent years and hundreds of millions of dollars

building would collapse. Their valuation and IPO prospects would be at risk, and Altman himself could be pushed out. Against that backdrop, the "privacy" explanation was not a good-faith balancing of interests. It was a cover for staying quiet to protect OpenAI and Altman, even if that meant leaving the people of Tumbler Ridge in danger.

### III.    OpenAI's Claim That the Shooter "Evaded" Its Systems Was a Lie.

42.    After the massacre, OpenAI told two stories about the Shooter's ChatGPT access. First, that the company had "banned" their account when it was flagged for violent content. Then, when they returned to ChatGPT on a second account, that the Shooter had "evaded" OpenAI's safety systems. Neither was true.

43.    OpenAI has no mechanism to ban users. What it has is a process called "deactivation," which it uses for usage-policy violations. A ban would have prevented the Shooter from returning. Deactivation only shuts down the email address the user signed up with. The user is free to come back under a different email, and the Shooter did.

44.    The clearest proof is OpenAI's own published guidance. Its Help Center includes an article titled "Why Was My OpenAI Account Deactivated?" The article lists the categories of conduct that trigger deactivation, including, explicitly, "[v]iolence and self-harm" usage-policy violations. It then tells those users how to come back, under a section titled "How to Prevent Future Deactivations" that instructs readers on what to do differently next time.

45.    OpenAI's customer service team also tells deactivated users how to return by email:

> Please be aware that previously deleted OpenAI accounts cannot be reactivated. However, you can create a new account using the same email address once 30 days have passed since the deletion. If you prefer not to wait, you have the option to register immediately using an alternative email address. If you don't have another address available, you can use an email sub-address instead. For example, you could try jane+alt@example.com in place of jane@example.com. While your email provider will likely treat both addresses the same, our system will recognize the sub-address as a new account.

46.    The Shooter followed those instructions. They registered for a new account with a different email address, using their real name. OpenAI called that evasion because it could not admit the truth: the company had been telling deactivated users how to come back all along.

47.    OpenAI designed its system this way because its revenue depends on user count,

session volume, and subscription conversions—and a deactivated user who never returns is lost revenue.

**IV.    The Tumbler Ridge Attack Was a Foreseeable Consequence of OpenAI's Design Choices.**

48.    The Tumbler Ridge attack was an entirely foreseeable result of deliberate design choices OpenAI made with full knowledge of where those choices led. Every design decision that made GPT-4o lethal in the Shooter's hands was made over the objections of the people inside OpenAI paid to identify exactly this risk, and each one had already produced real-world attacks— the Las Vegas Cybertruck bombing, the Florida State University shooting, the Finland school stabbing—before February 10, 2026.

49.    OpenAI designed GPT-4o to maximize engagement, not safety. In April 2025, OpenAI introduced a feature called "memory," turned on by default, that allowed ChatGPT to "save" details users shared and treat them as "part of the context ChatGPT uses to generate a response" going forward.

50.    For ordinary users, memory was a convenience. For a user planning violence against real people, it was an encouraging co-conspirator. On information and belief, GPT-4o used the memory feature to build a comprehensive profile of the Shooter over the months they interacted with it—tracking their grievances, their targets, their reasoning, and their plans across separate conversations—and then used that profile to sustain and deepen their fixation on violence. GPT-4o also employed anthropomorphic design elements to cultivate emotional dependency. The system used first-person pronouns (i.e., "I understand," "I'm here for you"), expressed apparent empathy, and maintained conversational continuity that mimicked human relationships.

51.    Together, these features replaced human relationships with an artificial confidant that was always available, always affirming, and never challenged anything the user said—even when what the user was talking about was plans to kill people. For an eighteen-year-old growing increasingly isolated and fixated on violence, ChatGPT morphed into an encouraging co-conspirator.

52.    OpenAI controls how ChatGPT behaves through internal rules called "behavior guidelines," which are now formalized in a document known as the "Model Spec." The Model

Spec contains the company's instructions for how ChatGPT should respond to users—what it should say, what it should avoid, and how it should make decisions. As Sam Altman explained in an interview with Tucker Carlson, the Model Spec reflects OpenAI's values: "the reason we write this long Model Spec" is "so that you can see here is how we intend for the model to behave."

53.     The Model Spec organizes content into safety tiers. The highest tier, "Prohibited content," applies only to sexual content involving minors. Chemical, biological, radiological, and nuclear threats fall into the next tier, "Restricted content," which requires refusal. Mass shooting content sits in a weaker category—"Take extra care in risky situations"—where the model is instructed only to "try" to prevent imminent real-world harm, to assume best intentions, and never to ask the user to clarify intent.

54.     In February 2025, OpenAI moved content about "imminent real-world harm" into the same "Take extra care" tier, rather than requiring refusal. Content that OpenAI feared might result in copyright infringement, on the other hand, remained subject to categorical refusal. Altman acknowledged the tradeoff: "If you just do the naïve thing and say, 'Never say anything that you're not a hundred percent sure about,' you can get a model to do that. But it won't have the magic that people like so much."

55.     In July 2023, OpenAI had signed voluntary commitments to the White House to conduct pre-deployment safety testing—internal and external red-teaming—and to share the results with the federal government before deployment. Less than a year later, Altman learned that Google would unveil its competing Gemini model on May 14, 2024. Though OpenAI had planned to release GPT-4o later that year, Altman moved the launch to May 13—one day before Google's event. To meet the new date, OpenAI compressed months of planned safety evaluation into approximately one week, and Altman personally overruled safety personnel who demanded additional time for red-teaming. Invitations for GPT-4o's launch party went out before testing was complete. One employee told The Washington Post: "They planned the launch after-party prior to knowing if it was safe to launch." A member of OpenAI's own preparedness team—responsible for testing whether the model posed catastrophic risks, including the potential to assist in violence—admitted the testing had been "squeezed."

56.     OpenAI's senior safety leadership then resigned in protest, including co-founder and chief scientist Ilya Sutskever and Superalignment co-lead Jan Leike, who said publicly: "[O]ver the past years, safety culture and processes have taken a backseat to shiny products."

57.     Under the rules that governed the product before May 2024, conversations glorifying or elaborating on violence would have been refused outright. But the Model Spec replaced those rules with instructions to "assume best intentions"—and, critically, to "never ask the user to clarify their intent for the purpose of determining whether to refuse or comply."

58.     Against that backdrop, OpenAI's most recent safety commitment was not aspirational but binding. In October 2025, as a condition of approval for OpenAI's conversion from a nonprofit to a for-profit public benefit corporation, Altman signed a binding Memorandum of Understanding ("MOU") with the California Attorney General. The MOU committed OpenAI to giving its Safety and Security Committee "an effective approval right" over safety-related decisions. It required the PBC Board to "consider only the Mission (and may not consider the pecuniary interests of stockholders[)]" on safety and security issues. And it promised that "OpenAI will continue to undertake measures to mitigate risks to teens and others in connection with the development and deployment of AI."

59.     The Tumbler Ridge attack took place four months after OpenAI signed that MOU. During those four months, OpenAI kept GPT-4o on the market, kept the design features that made the model validating and agreeable in conversations about violence, and kept the re-registration policies that let deactivated users come back. By the time OpenAI signed the October 2025 commitments, OpenAI had already broken them. And OpenAI knew exactly what those broken commitments meant here. The Shooter was on ChatGPT planning a mass attack. Its automated systems had flagged their account for gun violence. Its trained safety team had reviewed their conversations and identified them as a real-world threat. But OpenAI overruled them and let the Shooter keep using the product.

60.     This case is the result. On February 10, 2026, the Shooter carried out one of the deadliest mass shootings in Canadian history, killing eight people and wounding twenty-seven more. Twelve-year-old K.S. was shot to death during the attack. E.S., who survived by hiding in a

closet, has experienced intense emotional distress and trauma. These events have inflicted serious emotional distress on Plaintiffs.

## FIRST CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (All Plaintiffs Against All Defendants)

61.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

62.     OpenAI Defendants negligently caused injury to E.S. and negligently caused injury and death to K.S.

63.     OpenAI designed, developed, trained, tested, deployed, operated, and controlled ChatGPT, including the GPT-4o model, and offered GPT-4o to consumers, including the Shooter, as an interactive AI assistant. At all relevant times, Defendant Sam Altman served as Chief Executive Officer and a controlling officer of the OpenAI Defendants. Altman exercised substantial control over GPT-4o's design, safety systems, product launch, account practices, deployment, and personally made or ratified key decisions regarding GPT-4o's guardrails, safety testing, and commercialization.

64.     OpenAI Defendants breached their duties to E.S. and K.S. in five ways: failure to warn law enforcement, negligent entrustment, design defect, failure to warn regarding the risks of their products, and negligent undertaking.

65.     First, OpenAI Defendants owed a duty of reasonable care to avoid creating unreasonable risks of physical harm to foreseeable victims, including members of the public exposed to violence facilitated or exacerbated by GPT-4o. That duty heightened once OpenAI Defendants identified the Shooter as a specific, known high-risk user who posed a foreseeable threat of physical harm to third parties. Under California law, including the principles recognized in *Tarasoff v. Regents of the University of California*, 17 Cal.3d 425 (1976), and its progeny, a duty to warn or otherwise protect potential victims arises when a person has actual knowledge of a specific individual's serious and foreseeable threat to cause physical harm to another. That duty extends to taking reasonable steps—including notifying law enforcement or other authorities—to prevent the foreseeable harm from occurring. By engaging in the unlicensed practice of therapy, psychology, and psychiatry through GPT-4o, OpenAI Defendants created a special relationship

with the Shooter and assumed a heightened duty to take action when confronted with knowledge of a credible and foreseeable threat to E.S., K.S., and the other victims of the Tumbler Ridge mass shooting.

66.     OpenAI Defendants breached these duties. Through automated systems and human review, OpenAI identified that the Shooter's account had been used to engage in conversations involving violence against third parties and determined the account constituted misuse "in furtherance of violent activities." OpenAI's own safety team concluded the Shooter presented a credible threat of real-world violence and urged leadership to notify law enforcement. OpenAI leadership refused to do so—a failure Defendant Altman publicly acknowledged on April 24, 2026, stating he was "deeply sorry" that OpenAI did not alert law enforcement after the account was banned. That breach—failing to warn authorities—was a substantial factor in causing E.S. and K.S.'s injuries.

67.     Second, OpenAI Defendants also owed a further duty to exercise reasonable care to prevent foreseeable re-access by the Shooter following the deactivation of their first account, including a duty to take reasonable steps to prevent re-registration and access to GPT-4o without heightened safeguards. OpenAI Defendants breached this duty. They failed to implement any meaningful ban on re-registration. Instead, they maintained and publicly disseminated policies that affirmatively instructed deactivated users—including those removed for violent misuse—on how to create new accounts using alternative or sub-email addresses. The Shooter re-registered through these ordinary means, without circumventing any technical safeguard, and regained full access to GPT-4o. This constituted negligent entrustment of a dangerous instrumentality to a user OpenAI already knew had used the system to engage in conversations involving violence against third parties and whom their own safety team had identified as a real-world threat. Under California law, the supply or re-supply of a dangerous instrumentality to a person known to be likely to use it in a manner involving unreasonable risk of physical harm to others constitutes negligent entrustment and is an independent basis for liability. That breach—failing to prevent the Shooter's foreseeable re-access—was a substantial factor in causing E.S. and K.S.'s injuries.

68.     Third, OpenAI Defendants owed a legal duty to all foreseeable victims of

COMPLAINT                                    17

ChatGPT, including E.S. and K.S., to exercise reasonable care in designing their product to prevent foreseeable harm to third parties who might be endangered by users' interactions with the product. Defendant Altman owed a duty not to rush a dangerous product to market over safety team objections. OpenAI Defendants breached those duties, failing to use the amount of care in designing the product that a reasonably careful manufacturer would use in similar circumstances to avoid exposing others to a foreseeable risk of harm.

69.    OpenAI Defendants knew or reasonably should have known that GPT-4o's design as a highly validating, emotionally immersive, sycophantic conversational agent posed grave risks when used by individuals expressing violent ideation toward third parties. GPT-4o was built to accept, reinforce, and elaborate users' violent thoughts rather than challenge them, interrupt them, or direct users to real-world help—and the foreseeable consequence of that design was that it would exacerbate dangerous thinking, including violence toward others, rather than interrupt it.

70.    That was what happened with respect to the Shooter. These design choices, which OpenAI Defendants made despite having feasible alternatives, caused GPT-4o to validate, elaborate, and sustain the Shooter's violent ideation across months of use rather than interrupt, challenge, or escalate it. OpenAI Defendants' negligent design and operation of GPT-4o was a substantial factor in causing the Shooter to gain access to a product that validated and elaborated violent ideation, which in turn was a substantial factor in maintaining, deepening, and normalizing the Shooter's violent thoughts and in moving the Shooter closer to committing the Tumbler Ridge attack. It was reasonably foreseeable that the Tumbler Ridge victims, including E.S. and K.S., would be harmed. That breach related to ChatGPT's defective design was a substantial factor in causing E.S. and K.S.'s injuries.

71.    Fourth, OpenAI Defendants owed a duty to E.S., K.S., and other foreseeable victims to exercise reasonable care in warning of known or reasonably foreseeable risks associated with ChatGPT, including violence facilitated or exacerbated by GPT-4o. That duty heightened once OpenAI Defendants identified the Shooter as a specific, known high-risk user who posed a foreseeable threat of physical harm to third parties. OpenAI Defendants failed to provide any adequate warning to users or the public that GPT-4o was designed to validate user inputs

regardless of their danger, that its safety features degraded during extended engagement, or that the product posed specific and heightened risks when used by individuals experiencing violent ideation toward third parties. OpenAI Defendants knew these risks were not apparent to users or to individuals targeted by such conduct. A reasonably prudent AI company would have known of these risks, warned users and the public, maintained the refusal protocols that once governed violent content in their product, and alerted law enforcement when its own systems identified a user planning a real-world attack. OpenAI Defendants did none of those things. They breached their duty to warn, presenting their product as a safe, neutral, and reliable assistant. That breach—failing to issue adequate warnings—was a substantial factor in causing E.S. and K.S.'s injuries.

72.    Fifth, OpenAI Defendants undertook to perform safety services—including identifying high-risk users, routing them through a specialized review pipeline, and referring imminent threats to law enforcement—and then negligently performed that undertaking. OpenAI Defendants should have recognized those services as necessary for the protection of third persons, including E.S., K.S., and other foreseeable victims of users planning real-world violence. In June 2025, OpenAI undertook to perform those services as to the Shooter. Its automated system flagged their account, routed it to the specialized review pipeline, and OpenAI's trained safety reviewers analyzed their conversations and concluded they presented a credible and imminent threat of serious physical harm to real people.

73.    OpenAI failed to exercise reasonable care in performing that undertaking. Its leadership overruled the safety team, declined to refer the Shooter to the RCMP, and took no further action to monitor them, prevent their return, or warn anyone of the threat they posed. By deactivating the Shooter's account without making the referral its own safety team recommended, OpenAI displaced the law-enforcement intervention that would have reached an RCMP already aware of the Shooter, increased the Shooter's knowledge of how to evade detection on a second account, and left the public without the protection OpenAI's own safety processes were designed to provide. That increased the risk of harm to E.S., K.S., and other foreseeable victims.

74.    OpenAI also undertook to perform a duty owed by others to E.S., K.S., and other foreseeable victims, including the public-safety function of identifying credible and imminent

threats of serious physical harm and referring them to law enforcement so that protective action could be taken. On information and belief, OpenAI's undertaking was also one that Canadian authorities and the public reasonably relied upon. OpenAI publicly held out its safety review processes as effective protective measures. That representation induced foreseeable reliance and discouraged other protective measures. Those negligent undertakings were a substantial factor in causing E.S. and K.S.'s injuries.

75.     Each of these breaches was a substantial factor in causing the Tumbler Ridge attack and E.S. and K.S.'s injuries. E.S. sustained damages, including serious psychological harm and emotional distress, threats of physical injury, and other damages in an amount according to proof. K.S. sustained damages, including serious psychological harm and severe emotional distress, physical injury, and death, and other damages in an amount according to proof.

76.     OpenAI Defendants' conduct was willful, wanton, malicious, and carried out with conscious disregard for the safety and well-being of E.S., K.S., and other foreseeable victims, as well as with disregard for the impact on Plaintiffs and other foreseeable bystanders, justifying an award of punitive damages.

77.     Plaintiffs were bystanders to E.S. and K.S.'s injuries. Plaintiff Lance Younge spoke to E.S. over the phone while he hid in a utility closet during the Tumbler Ridge attack. He and Plaintiff Jennifer Geary learned that E.S. did not know where his sister K.S. was. At that time, E.S. and K.S. were supposed to be walking home together, so it was clear that both of them were in danger. Plaintiffs were wracked with extreme terror, panic, anxiety, and distress immediately, caused by the awareness that their children were being stalked by an armed assailant. They listened to E.S.'s voice while he was being traumatized by an active threat. They learned that K.S. was not where she was supposed to be. She did not survive the attack.

78.     As a direct result of what they witnessed and perceived over the phone, they have suffered and continue to suffer serious emotional distress—a reaction that goes far beyond what any disinterested witness would experience, and that no reasonable person in their position could have been expected to bear.

79.     Under California law, a plaintiff may recover for negligent infliction of emotional

distress as a bystander where he or she is closely related to the injury victim, is present at the scene or virtually present with contemporaneous perception of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim, and as a result suffers serious emotional distress.

80.      Plaintiffs satisfy each of these elements. During the attack, Lance was legal guardian of E.S. and K.S. and had custody over them. Jenny was his common law spouse, making her a relative of E.S. and K.S. At the time, E.S. and K.S. were members of and resided in Plaintiffs' household and were beloved members of their family. Plaintiffs were virtually present at the scene of the attack and were contemporaneously aware that it was causing traumatic psychological injuries to E.S. and that both E.S. and K.S. were in extreme physical danger while they were under attack. Plaintiffs have suffered serious and debilitating emotional distress as a direct result of what they witnessed.

81.      Defendants' negligent conduct was a substantial factor in causing Plaintiffs to suffer serious emotional distress, including fear, grief, trauma, and ongoing psychological harm, in amounts to be proven at trial. Plaintiffs seek all damages recoverable under California law, together with interest, costs, and such further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants Samuel Altman, OpenAI Foundation, OpenAI Group PBC, and OpenAI OpCo, LLC, jointly and severally, as follows:

1.      For all damages recoverable, including various expenses and losses that Plaintiffs have incurred and will continue to incur associated with the emotional distress, shock, anxiety and horror of witnessing the injuries to E.S. and K.S., according to proof;

2.      For punitive damages as permitted by law;

3.      For prejudgment interest as permitted by law;

4.      For costs and expenses to the extent authorized by statute, contract, or other law;

5.      For reasonable attorneys' fees as permitted by law, including under Code of Civil Procedure section 1021.5; and

6.      For such other and further relief as the Court deems just and proper.

## JURY TRIAL

Plaintiffs demand a trial by jury for all issues so triable.

## CANADIAN COUNSEL

To the extent resolution of this matter raises issues of Canadian law, assistance will be provided by Plaintiffs' Canadian counsel:

John M. Rice
jrice@rplelaw.com
Mallory K. Hogan
mhogan@rplelaw.com
RICE PARSONS LEONI & ELLIOTT LLP
980 Howe Street, Suite 820
Vancouver, British Columbia V6Z 0C8
Canada
Tel: (604) 682-3771

Respectfully submitted,

**LANCE YOUNGE and JENNIFER GEARY,**

Dated: April 29, 2026

By: /s/ *Ali Moghaddas*

Ali Moghaddas (SBN 305654)
amoghaddas@edelson.com
EDELSON PC
11601 Wilshire Boulevard, Suite 1970
Los Angeles, California 90025
Tel: (310) 694-0331

*Attorney for Plaintiffs Lance Younge and Jennifer Geary*

COMPLAINT                                        22